Filed 4/18/14  In re Jacob C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re JACOB C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JACOB C.,<br><br>    Defendant and Appellant. | G048277<br><br>(Super. Ct. No. DL044305)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Cheryl L. Leininger, Judge.  Affirmed.

William G. Holzer for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Warren Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Jacob C., a minor, appeals from the juvenile court order of wardship (Welf. & Inst. Code, §§ 602, 725)[1] based on the finding he violated Penal Code section 242 (battery), a misdemeanor.  He was placed on home probation in the custody of his father, subject to certain terms and conditions.  On appeal, Jacob maintains the court abused its discretion by declaring him a ward of the court, and instead should have placed him on non-wardship probation.  (§ 725, subd. (a).)  We affirm the juvenile court's order.

I

Sixteen-year-old Jacob was living with his mother (hereafter Mother) and younger brother (hereafter Brother).  On March 3, 2013, Mother did not want Jacob to play on his Xbox video game console.  In Jacob's bedroom, they got into an argument and Mother attempted to take the game console's power cord.  The argument escalated and the pair began yelling and tugging on opposite ends of the cord.  Jacob slapped Mother on the forehead.

Brother saw the slap and heard Mother angrily ask Jacob, "'Why?'" and "'I didn't hit you.'"  This prompted 15-year-old Brother to intervene and push the pair apart.  Mother left the room and went downstairs.  Brother said he called 911 within five minutes because Jacob would not calm down.  Brother saw Jacob walk around the house and push items over, dumping things on the ground.  He reported to the police dispatcher that Jacob was being aggressive and hit Mother.  He also stated Jacob had been smoking marijuana, and he used marijuana daily.

Brother said Jacob left the house after he called 911.  Approximately 10 minutes later, Deputy Brandi Campbell arrived at the home and noticed red marks on Mother's forehead.  Campbell spoke with Brother, who stated he tried to calm Jacob down, but he was afraid and called the police.  Mother signed a private person's arrest

---

[1]     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

form.  After speaking with Mother and Brother, the officer determined Jacob should be arrested.  Campbell took a photograph of Mother from a distance of approximately six feet away.  She opined the redness in Mother's face was not shown in the photograph.  Campbell stated she tried to take the picture from several different angles to document the injury, but "it wasn't coming out."

The court considered a pre-trial probation report.  It stated deputies had previously responded to the residence in October 2011 and August 2012 regarding arguments between Mother and Jacob.  On the date of the incident, Mother stated Jacob smoked marijuana, drank alcohol, and was disrespectful.  Mother said she no longer wanted Jacob to live with her and she feared for the safety of herself and three younger children.

The report also contained information from several interviews conducted at juvenile hall the day after the incident.  Mother stated Jacob had hit her two or three times before.  She stated he started to become physically assaultive two years ago and he had been verbally disrespectful since the age of seven or eight.  She added Jacob did not follow her household rules.  She restated Jacob should live with his father.

Jacob's father (Father) stated he did not believe Jacob intentionally hit Mother and stated their arguments "often escalate unnecessarily."  Father reported he was willing to have Jacob live with him.

When Jacob was interviewed, he denied intentionally hitting Mother.  He maintained Mother was cursing at him and calling him mean names.  When he tried to leave, he had to "squeeze by her" and in the process his fingertips "'swiped across her face.'"

The pre-trial report also described the family's situation.  Jacob's parents were never married but lived together for three years.  Mother had legal custody of Jacob and his three younger siblings.  Father has visitation rights every other weekend.  Mother reported Father's visits were infrequent, and she attributed some of Jacob's issues to

3

Father's lack of involvement. Jacob stated he saw Father a couple times a week, but Father did not have a place for him and his siblings to stay.

Mother was briefly married from 2010 to 2011, and her ex-husband (who is not Jacob's father) frequently hit Jacob. She reported Jacob was in counseling from 2008 to 2011 and prescribed medication for depression and ADHD. She said he stopped taking the medicine and going to counseling because there was a different counselor and Jacob did not like the medication's side effects.

Jacob recently stayed with a friend's family for a month because of ongoing problems with Mother. Mother also reported Jacob ran away from home for three days. Jacob denied running away.

Jacob had no prior criminal record and no history of gang association. Mother believed Jacob had taken things from her and his younger sister. Jacob admitted stealing $20 from his sister one time. Jacob reported he first tried marijuana at age 14, and he smoked marijuana a couple times a week. He first tried alcohol at age 15, and he drank approximately once every two months. Jacob denied using other illegal substances.

Jacob's first semester grades for the tenth grade included four "Ds" in core subjects, a "C" in physical education, and a "C+" in art. Jacob explained the reason his grades were poor was because he is lazy and he does not like to do homework. Mother reported that before high school, Jacob was a straight A student. Father opined Jacob had gotten into the wrong crowd and his grades had suffered because Jacob played too much Xbox. Jacob was once suspended in the 9th grade for fighting with another student. Due to a poor attendance record, Jacob has occasionally attended school on Saturdays. The probation department recommended Jacob be declared a ward of the court.

At trial, 15-year-old Brother testified he believed the slap was accidental and the only reason he called the police was because he believed the police would clam Jacob down. He had called the police once before. Brother stated that if he tried to get in

4

Jacob's way or told him to stop, Jacob would get "even more mad." Brother explained he did not tell the police the slap was accidental because they would not have come to the house. Brother said the fighting made him upset. He stated Jacob did not smoke marijuana daily, and he did not see Jacob smoke any the day of the incident. He stated his report to the 911 operator about Jacob was an exaggeration.

At trial, Mother testified she had a heated argument with Jacob that had started the day before. Mother had taken the Xbox away from Jacob and he was not supposed to be playing with it. Mother stated Jacob did not intentionally slap her. She admitted telling Campbell on the day of the incident that she was having issues with Jacob because he was being disrespectful, smoking marijuana, drinking alcohol, and ignoring her. Mother said she was very emotional when the police were there. Jacob had said he hated her during the argument.

Mother stated police had come to her home on a previous occasion because of an argument between herself and Jacob. She stated on the day of the incident she was being honest with the officers and signed a private person's arrest form, indicating she was afraid for her safety and her children's safety. Mother explained that now she has had time to think about the events that day, she no longer believed Jacob intentionally slapped her. She explained Jacob did not have a closed fist and he did not lunge at her. She said they were both yelling and using hand motions to communicate. In addition, she remembered Jacob was trying to get around her and out of the room when the contact occurred. Mother wrote a letter to the court indicating she no longer wanted to prosecute the case. She added her entire face normally gets red when she is upset. She was not injured or harmed in any way.

After hearing testimony from Mother, Brother, and Campbell, Jacob's counsel made a section 701.1 motion requesting dismissal of the case. The court denied the motion.

5

Next, the court heard Jacob's testimony. Jacob recalled that he and Mother were pulling the Xbox cord back and forth, and during the argument he "accidently swiped her" while making a hand motion. He stated his hand hit her nose, not her forehead or cheek. He stated they were both very upset and it was an accident. He recalled Mother asked him, "'Why did you hit me?'" He stated he replied, "'I didn't hit you.'" Jacob denied throwing things around the house after Mother left the room. Jacob admitted he intentionally knocked over one basket full of remotes because he was upset. He recalled leaving the house immediately after the incident. He claimed he was not aware Brother called 911.

Jacob testified he had gotten into other verbal arguments with Mother before this incident and on one occasion the police were called. He could not recall ever accidentally hitting Mother in the past. He denied smoking marijuana or drinking that day.

The juvenile court determined there was sufficient evidence of a battery as defined by Penal Code section 242. It stated, "This is a very sad and unfortunate case. I have no doubt that the family is a loving family and I suspect that what happened is . . . it got out of hand and now time has passed and everybody wishes it didn't happen and probably feel bad that it happened and would like it to just kind of go away. [¶] Unfortunately, it did happen. And I do not believe under any circumstances that this was an accident. I absolutely believe that it was intentional. I have no doubt about it and I do sustain the petition."

The court noted, "I think the witnesses would like to minimize it and perhaps are even in denial about the situation, but this is not normal teenage behavior. This is way beyond the normal teenage behavior. And I think that the minor was out of control on that day and the slap happened, and I think it was intentional. [¶] I think it's very unfortunate and I think you probably feel bad about it now. I think everybody would like it not to have happened but obviously there are some real issues here that have

6

to be dealt with, and this definitely happened and the court has no doubts about it whatsoever."

After a brief recess, the court considered Jacob's sentence. His counsel argued there were several letters written on Jacob's behalf, attesting to his good character. Counsel noted Jacob's family is very supportive and the minor was living with Father. Counsel asked if the court would be willing to impose a sentence under section 725 with community service and informal probation.

Counsel argued if the court was inclined to impose formal probation under section 602, Jacob was not having any issues in the home supervision program or in father's custody. Jacob had found a new school.

The court ruled, "I know that the family is a loving family and that they have been supportive, but there are definitely issues here that need to be addressed. I do not believe that [section] 725 is an appropriate disposition in this particular case so that request is denied." Next, the court stated it gave "great weight" to Campbell's testimony and she was an unbiased objective witness to the incident. The court then verified Jacob's age and address before declaring him a ward of the court. It placed him on probation, subject to several conditions.

## II

Jacob contends the court abused its discretion by declaring him a ward of the court. He maintains the court should have placed him on probation without declaring him a ward of the court. We find no reason to disturb the court's ruling.

*A. Applicable Case Authority*

We review a juvenile court's decision to declare a minor a ward of the court for an abuse of discretion, indulging all reasonable inferences to support its decision. (*In re Antoine D.* (2006) 137 Cal.App.4th 1314, 1320.) "An appellate court will not lightly substitute its decision for that rendered by the juvenile court." (*In re Michael D.* (1987) 188 Cal.App.3d 1392, 1395.) "We must indulge all reasonable inferences to

7

support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. [Citations.]" (*Ibid.*)

The juvenile court may proceed in one of three ways when the minor is a person described in section 602. The court may: (1) declare the minor a ward of the court; (2) order probation without declaring the minor a ward of the court; or (3) order probation after declaring the minor a ward of the court. (§§ 725, subds. (a) & (b), 727.)

If the juvenile court declares the minor a ward of the court, it may remove the minor from the physical custody of his parents or guardian and order the care, custody, and control of the minor to be under the supervision of the probation officer. (§§ 726, 727, subd. (a).) The probation officer may place the minor in an approved home of a relative, a suitable licensed community care facility, or a foster family agency, which in turn places the minor in a suitable licensed foster family home or certified family home. (§ 727, subd. (a)(3).)

If the juvenile court places the minor on probation without declaring him a ward of the court, the probation officer may supervise the minor up to six months. (§ 725, subd. (a).) The juvenile court has no authority to impose a condition of probation beyond this six-month statutory period under section 725, subdivision (a). "'[T]he power of the court with regard to probation is strictly statutory, and the court cannot impose a condition of probation which extends beyond the maximum statutory period of probation.' [Citations.]" (*People v. Gilchrist* (1982) 133 Cal.App.3d 38, 44.) Under this option, the court may declare the minor a ward of the court if the minor "fails to comply with the conditions of probation imposed[.]" (§ 725, subd. (a).)

In deciding the appropriate disposition, the juvenile court must consider the circumstances and gravity of the offense committed by the minor in addition to other relevant factors and material evidence. (§ 725.5.) Additionally, the court must be mindful of the purpose of the juvenile delinquency laws. "A fundamental premise of delinquency adjudication is that the court must focus on the dual concerns of the best

8

interests of the minor and public protection." (*In re Jimmy P.* (1996) 50 Cal.App.4th 1679, 1684.)

The juvenile court need not make specific findings on the record. (*In re John F.* (1983) 150 Cal.App.3d 182, 185.) Remand is required only where the juvenile court has demonstrably shown that it misunderstood the scope of its discretion or considered inappropriate factors in declaring a minor a ward of the court. (*In re Michael G.* (1977) 76 Cal.App.3d 872, 875 (*Michael G.*).)

*B. Wardship Analysis*

Jacob seeks to mitigate the gravity of the offense by arguing the crime was not serious. He characterizes the incident as simply an emotionally-charged family dispute over a game. He asserts a 16-year-old who slaps his mother should be offered a less restrictive treatment. He suggests the court should have ordered probation terms under section 725 (that required less than six months to complete), and if he failed to fulfill his obligations the court had the option to then declare him a ward of the court and extend the period of monitoring. He notes the court's current disposition will hinder his ability and opportunity to become a more productive member of the community because now he cannot possess a firearm until the age of 30, barring him from pursuing a career in the military or law enforcement.

Under the facts of this case, we conclude the juvenile court acted within its broad discretion in declaring Jacob a ward of the court. We appreciate it was a close case. Mother was not seriously injured. Jacob did not have a prior court record. By all accounts, Jacob has a loving family. However, there was certainly evidence supporting the adjudgment of a wardship. Jacob's life appears to be on a downward spiral. He admitted to having used drugs and alcohol for over the past year. His grades had fallen significantly and he was suspended for fighting. He suffered from mental health issues that were no longer being addressed. He had left home for extended periods of time. Mother reported this is not the first time Jacob had been physically assaultive. Indeed,

9

prior arguments between Jacob and Mother had ended with calls to the police. We agree with the juvenile court's conclusion it is not typical teenage behavior to become violent and aggressive with a parent for not being allowed to play a video game. Jacob did not just throw a teenage temper tantrum. Brother was so scared by Jacob's behavior he called the police. He believed only the police would be able to calm Jacob down. And Mother was also afraid of Jacob's temper. She filed a personal arrest report, stating she feared for her family's safety. The evidence amply supports the court's determination there were serious issues presented by this case and Jacob "was out of control on that day."

Moreover, the evidence showed Jacob was not receiving the proper guidance and supervision from his parents. Mother recognized she was unable to effectively parent or discipline Jacob. Jacob's contact with his father was limited, and he did not appear to be playing a parental role in Jacob's life. And there was evidence from which the juvenile court could infer that Jacob posed a threat to public safety if his behavior remained unchecked. Jacob's anger issues, coupled with drug usage and mental health issues certainly implicated a public safety concern.

In conclusion, Jacob's intentional and violent outburst, drug history, and family situation all support the juvenile court's conclusion a warship would serve the best interests of Jacob and the public. We have carefully reviewed the entire record, and it cannot be said the court's ruling was an abuse of discretion.

## C. The Court's Disposition Statement

Jacob asserts the court's disposition statement is "open to two separate interpretations" (capitalization omitted) that implicate his due process rights. As mentioned in the factual summary, after the juvenile court sustained the petition, it took a brief recess. When the hearing resumed, Jacob's counsel asked the court to consider a non-wardship probation under section 725, subdivision (a). The court responded "I do not believe that [section] 725 is an appropriate disposition in this particular case so that

10

request is denied." Next, the court stated it gave "great weight" to Campbell's testimony and it noted she was an unbiased objective witness to the incident. The court then verified Jacob's age and address before declaring him a ward of the court. It placed him on probation, subject to several conditions.

Jacob asserts the court's comment about Campbell's testimony is "perplexing" because it relates to the veracity of the underlying crime, not to whether Jacob should become a ward of the court. Jacob suggests there are two possible ways to interpret the court's statement: First, the court gave an erroneous reason for why it denied Jacob's request for a disposition under section 725, subdivision (a). Second, the statement was "a non sequitur stated by an overworked court, haphazardly justifying its decision to sustain the petition even though it had done so prior to the court recess." He concludes the first interpretation suggests the court misunderstood the extent of its discretion (citing *Michael G., supra,* 76 Cal.App.3d at p. 875), and the second supports changing the current law to require juvenile court judges to state reasons for declaring a minor a ward of the court. Jacob asserts the recitation of reasons will assist appellate review, prevent careless decisions, and promote public confidence.

We find no error in the juvenile court's dispositional statement. The court referred to several factors it considered before making its order. Because a court must consider the circumstances and gravity of the offense when deciding the appropriate disposition, we conclude the court's comments about Campbell's unbiased testimony about the events occurring the day of the battery appropriate. And contrary to Jacob's contention on appeal, the court mentioned other relevant factors and material evidence it had considered. It referred to the letters submitted on Jacob's behalf and the evidence Jacob's family was loving and supportive. Jacob's family's situation, as well as the circumstances and gravity of the battery, were both relevant to the court's determination of an appropriate disposition. (§ 725.5.)

11

This case is not like the situation in *Michael G*., where the juvenile court demonstrably showed it misunderstood the scope of its discretion. In that case, the juvenile court erroneously stated it believed it was illegal to impose conditions to a non-wardship probation under section 725, subdivision (a). (*Michael G, supra,* 76 Cal.App.3d at p. 874.) In contrast, all the facts discussed by the court reasonably supported its ruling. And because the court provided reasons in this case, we find it unnecessary to reach Jacob's assertion the law should be changed to require specific findings on the record in all cases.

### III

We affirm the juvenile court's ruling declaring Jacob a ward of the court.


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.